1  **WHATLEY KALLAS, LLP**
   Edith M. Kallas (To Apply *Pro Hac Vice*)
2  ekallas@whatleykallas.com
   1180 Avenue of the Americas, 20th Fl.
3  New York, NY  10036
   Tel: (212) 447-7060
4  Fax: (800) 922-4851

5  Alan M. Mansfield (Of Counsel, SBN: 125998)
   amansfield@whatleykallas.com
6  10200 Willow Creek Road, Suite 160
   San Diego, CA, 92131
7  Tel: (619) 308-5034
   Fax: (855) 274-1888
8
   **CONSUMER WATCHDOG**
9  Harvey Rosenfield (SBN: 123082)
   Harvey@consumerwatchdog.org
10 Jerry Flanagan (SBN: 271272)
   jerry@consumerwatchdog.org
11 2701 Ocean Park Blvd., Suite 112
   Santa Monica, CA 90405
12 Tel: (310) 392-0522
   Fax: (310) 392-8874
13
   **Attorneys for Plaintiffs**
14
                **UNITED STATES DISTRICT COURT**
15
              **SOUTHERN DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17 **JOHN DOE, on behalf of himself and all others similarly situated,** | Case No. **'14 CV 2986 LAB DHB** |
| 18 **Plaintiffs,** | **CLASS ACTION COMPLAINT** |
| 19 **v.** | **(1) Violation of Anti-Discrimination Provisions of Affordable Care Act, 42 U.S.C. § 300gg-4;** |
| 20 **AETNA, INC.; AETNA HEALTHCARE, INC.; AETNA** | |
| 21 **SPECIALTY PHARMACY, LLC, and DOES 1-10, inclusive,** | **(2) Violation of Anti-Discrimination Provisions of Affordable Care Act, 42 U.S.C. § 18116;** |
| 22 **Defendants.** | **(3) Claim for Benefits Due Under Health Plans Governed by ERISA, 29 U.S.C. § 1132(a)(1)(B);** |
| 23 | |
| 24 | **(4) Claim for Breach of Fiduciary Duties Under ERISA, 29 U.S.C. § 1132(a)(2);** |
| 25 | |
| 26 | **(5) Claim for Failure to Provide Full and Fair Review Required by ERISA, 29 U.S.C. § 1132(a)(3);** |
| 27 | |
| 28 | |

1

**(6) Claim for Failure to Provide an Accurate EOC and SPD Required by ERISA, 29 U.S.C. § 1132 (a)(3) and (c);**

**(7) Violation of Americans with Disabilities Act, § 42 U.S.C. § 12101, *et seq.*;**

**(8) Violation of Cal. Business & Professions Code Section 17200, *et seq.*, Unlawful Business Acts and Practices;**

**(9) Violation of Cal. Business & Professions Code Section 17200, *et seq.*, Unfair Business Acts and Practices;**

**(10) Violation of Cal. Business & Professions Code Section 17200, *et seq.*, Fraudulent Business Acts and Practices;**

**(11) Common Counts and Assumpsit/ Common Law Restitution;**

**(12) Breach of the Implied Covenant of Good Faith and Fair Dealing;**

**(13) Violation of Unruh Civil Rights Act, Cal. Civ. Code Section 51, *et seq.*; and**

**(14) Declaratory Relief**

**<u>Jury Trial Demanded On All Claims So Triable</u>**

Plaintiff, by and through the undersigned attorneys, brings this action on behalf of himself and all others similarly situated against Defendants Aetna, Inc., Aetna Healthcare Inc. ("AetnaHealthcare"), Aetna Specialty Pharmacy LLC ("ASP") and DOES 1-10, inclusive (hereafter collectively "Defendants" or "Aetna").[1]  Plaintiff alleges the following on information and belief, except as to those allegations that pertain to the named Plaintiff, which are alleged on personal knowledge:

---

[1] Coverage sold or administered by Aetna Healthcare and other Aetna subsidiaries, is referred to herein as "health plan" or "plan."  "Enrollees" and "members" refer to individuals enrolled in Aetna or other Aetna subsidiary health plans.

CLASS ACTION COMPLAINT

**NATURE OF THE ACTION**

1.     Plaintiff anonymously[2] brings this action to challenge Aetna's discriminatory business practices targeting consumers enrolled in Aetna health plans in the United States who suffer from HIV/AIDS and are prescribed specialty medications for the treatment of that condition.   In a change that Aetna recently announced and will implement as of January 1, 2015, Aetna enrollees are being told they are now required to obtain their specialty medications to treat HIV/AIDS and other serious illnesses from ASP, a wholly-owned subsidiary of Aetna, Inc.   ASP only delivers medications by mail-order, which threatens HIV/AIDS patients' health and privacy.   If HIV/AIDS patients do not obtain their specialty medications from ASP, they must pay thousands of dollars or more each month to purchase their medications at their community pharmacy (hereafter, the "Program").   The dramatic cost increase is the result of Aetna's reduction in health plan benefits effectuated by transforming drug purchases at community pharmacies from an "in-network" covered benefit to an "out-of-network" payment.   Under the Program, patients using a community pharmacy will be considered going "out-of-network" and will be subject to "non-Network Benefit" charges under the terms of their health plans.

2.     Even if HIV/AIDS patients obtain their medications by mail-order through the Program they still face discriminatory pricing in the form of a 20% coinsurance charge of up to a $150 maximum per prescription.   Prior to the health plan changes implementing the Program consumers paid a fixed co-pay of $20-$70 per prescription.

/ / /

---

[2]   Due to the sensitive nature of this action, Plaintiff has chosen to file under a fictitious name.   (*See, e.g., Doe v. Kaweah Delta Hosp.*, 2010 U.S. Dist. LEXIS 135808 (E.D. Cal., Dec. 22, 2010) [AIDS/HIV patient permitted to proceed anonymously]; *Does I thru XXIII v. Advanced Textile Corp.* 214 F.3d 1058, 1067 (9th Cir. 2000) [holding that one of the grounds for proceeding anonymously was that anonymity was necessary "to preserve privacy in a matter of sensitive and highly personal nature."].)

3

3.     Enrollees purchasing prescription drugs that Aetna does not consider "specialty medications" may continue to purchase their medications at a community pharmacy without penalty.  As a result of Defendants' discriminatory behavior, HIV/AIDS patients face a potentially life-threatening decision that also threatens their privacy and reduces their current health plan benefits.  They must either: (1) forego essential counseling from an expert pharmacist at a community pharmacy who knows their medical history and who, working directly with patients in face-to-face interactions, is best positioned to detect potentially life-threatening adverse drug interactions and dangerous side effects, immediately provide new drug regimens as their disease progresses, and can provide essential advice and counseling that help HIV/AIDS patients and families navigate the challenges of living with a chronic and often debilitating condition; or (2) pay thousands of dollars out-of-pocket for their medications at their community pharmacy.

4.     For all but the wealthiest HIV/AIDS patients, such dramatic cost increases are untenable and thus many Class members are left with no choice but to risk their health and privacy by obtaining their life-sustaining medications by mail.

5.     Plaintiff has attempted to resolve this matter informally with Aetna prior to bringing this action, but Aetna has refused to honor any opt out requests from the Program.  Plaintiff thus brings this action on behalf of himself and on behalf of a class (defined herein) of residents in the United States who: (i) are currently enrolled in a health plan provided by Aetna Healthcare, or another Aetna subsidiary, or a health plan in which Aetna is the Plan Administrator, including an individual plan, government plan, church plan or group plan, that provides prescription drug benefits; and, (ii) have been prescribed specialty medications to treat HIV/AIDS that they must now obtain under the Program.

6.     In a November 3, 2014 form letter (the "November Letter") sent to some affected patients (*see* Ex. 1, which is incorporated herein by reference), Aetna wrote that it was making certain changes to its formulary "to help you receive high-

quality, cost effective health care." Nowhere does the November Letter actually advise patients they are soon going to be required to solely use a mail-order program to obtain their life-sustaining medications, and many consumers are likely confused and deceived by the terminology of the November Letter. The only reference to the Program is on the second page, which indicates that HIV/AIDS drugs have been "Moved to SPB," which is accompanied by the obscure statement that the "drug is moving to specialty pharmacy benefit." No further explanation is provided. However, a form ASP created in October 2014, entitled "HIV/AIDS Medication Request", makes clear that the only way Aetna members can obtain HIV/AIDS medications is by mail-order through ASP, located in Orlando, Florida.

7. This limitation is a material change to Class Members' pharmacy benefits and violates both federal law and California law as described herein. One harmful aspect of this policy change is that the Program does not allow for early refills; patients cannot refill their medication until the very end of their current prescription. As a result, Aetna enrollees will be forced to call or fax ASP each month to re-order drugs, as further described below, during a very narrow period of time. If there are circumstances that make it difficult for the patient to re-order drugs at the time—for the example, workload, travel, illness—or if there are any processing or mail delays, HIV/AIDS patients will likely miss doses and potentially experience serious health problems as a result.

8. Aetna is unilaterally making these changes to enrollee health plans during the middle of their coverage, even though this is a material alteration and reduction of medical benefits under Aetna's health plans.

9. In addition to the potentially life threatening health consequences of the Program as discussed below, Class Members' fundamental and inalienable right to privacy is also threatened. For example, HIV/AIDS specialty medications often are delivered in refrigerated containers. Class Members who live in apartment buildings or will be required to have medications delivered to their work place have

5

expressed alarm that neighbors and co-workers, who do not know that the recipient has HIV/AIDS, will come to suspect that they are ill.  Mail-order shipments also present the risk of lost or stolen medications, as each shipment of medications may be worth thousands of dollars.  Class Members bear the financial risk of lost shipments left at their door or in their mailbox.  Alternatively, the recipient must be present when the package is delivered, thus forcing the patient to obtain needed medications on the schedule of the delivery person, which raises further privacy and personal liberty concerns.

10.     The Program constitutes a material and discriminatory change in Class members' coverage, a significant reduction in benefits, and a violation of the standards of good health care and clinically appropriate care for HIV/AIDS patients.  By implementing such practices, Aetna will thus reduce the quality of prescription drug care provided to Class Members by forcing enrollees to only obtain such medications through their sister co-conspirator and wholly-owned subsidiary ASP – allowing Aetna to profit through this conduct by keeping hundreds of thousands of dollar in prescription fill fees to themselves.  As a result, many Class Members have already expended resources in response to the Program, and presently are threatened with substantial, imminent, and irreparable harm.  This harm includes a grave threat to their health and safety as well as their right to privacy.

11.     Defendants' mail-order program is further flawed because it does not allow subscribers to transfer all of their medications to the mail-order program even if a subscriber wants to use mail-order for all prescriptions.  Instead, the mail-order program is limited exclusively to specialty medications, requiring the patient to manage prescriptions between several locations and bounce between their community pharmacy and receiving their mail-order deliveries.

12.     Defendants' decision to force Class Members to accept ASP as their exclusive mail-order provider under the Program is primarily motivated by

profit. As a result of the Program, Aetna and ASP will likely continue to see a substantial increase in revenues and even greater increases in profits as a result of the forced transition of its enrollees.

### The Role of the Clinical Pharmacist and the Importance of Face-to-Face Interactions

13.     Many physicians specializing in HIV/AIDS treatment are unable to spend very long with each patient.  In fact, physician consultations are often limited to just 15 minutes in the era of managed care.  As a result, there is very limited time for the physician to elicit extensive information about the patient's complete medical history, including which non-HIV/AIDS medications the patient is taking, and impart critical information about prescription drug regimens and warnings about the high number of known adverse side effects and adverse drug interactions associated with HIV/AIDS medications.

14.     Moreover, for many Class Members, HIV/AIDS is not their only medical condition.  Many patients have a history of cardiovascular disease, hypertension, anemia, diabetes, and psychiatric issues, among other conditions. Medications that manage mental health issues, for example, such as anti-depressants, anti-psychotics, and sleep agents, among others, are often not prescribed by the physician managing the patient's HIV/AIDS conditions.

15.     A patient's community pharmacist, however, is typically aware of the patient's entire medical history, has a comprehensive view of the patient's complete medication load (as compared to only certain specialty medications), and has on-going communications with physicians and patients regarding potential issues that may arise concerning drug side effects, adverse drug interactions, and adherence to specialty medications.

16.     The ability of community pharmacists to closely monitor HIV/AIDS patients in face-to-face encounters is life-saving in many instances.  In the case of a patient with a history of depression, for example, a community pharmacist can

work with the patient through regular "check-ins" as changes in mood, attitudes or day-to-day function would change if an HIV/AIDS medication, such as Atripla (with documented central nervous system side effects), were prescribed.  Other side-effects provide visual cues—for example, changes in skin color—that cannot be detected over the phone.  Additionally, community pharmacists, who serve patients prescribed medications by numerous doctors, may have more experience and information about potential adverse drug interactions and changes in drug regimens than physicians themselves.

17.    HIV/AIDS patients, therefore, rely on their community pharmacist to remind them how and when drugs must be taken, to review potential side effects with many other medications and to develop strategies to avoid those side effects, and to provide other counseling including what to expect if a patient's drug regimen changes.

18.    Conversely, mail-order pharmacies providing only specialty medications as required under the Program lack the ability to fully monitor adverse drug interactions since most HIV/AIDS patients are prescribed both specialty and non-specialty medications, including over-the-counter medications that do not require a prescription and therefore are not tracked in the same manner as prescription medications.

19.    Since only specialty medications are to be filled by Aetna's wholly owned subsidiary ASP, and non-specialty medications are to be filled at the patient's community pharmacy, ASP will not always have a full and accurate record of all the medications the patient is taking and therefore cannot anticipate or warn against potential adverse drug interactions, which are common with HIV/AIDS medications.

20.    In addition, the ASP personnel with whom Class Members typically directly interact are not pharmacists nor do they have specific knowledge about HIV/AIDS, but rather are general customer service representatives with no

8

specialized training.   Thus, taking the local pharmacist, and the community pharmacy where they provide their services, out of the treatment equation for HIV/AIDS patients results in a loss and injury to Class Members as well as lessens the quality of care and benefits they receive.

21.    This harm is not conjectural or speculative, but real, imminent and severe.  "Putting a label on the bottle — that's the least of what we do," Marva Brannum, a clinical pharmacist at Edwin's Prescription Pharmacy in North Hollywood, California, has explained.  Ms. Brannum, who has worked with HIV and AIDS patients for nearly 30 years, said working with patients also includes knowing the psychological and social issues involved with their disease states and providing a critical informed link between doctor and patient.  Importantly, working with patients directly allows pharmacists to monitor potential adverse drug interactions.  "We are an extension of the patient's clinical team," Brannum said.

22.    The Program thus reduces the overall quality of care Class Members receive and reduces their health plan benefits, since providing an effective pharmacy benefit for HIV/AIDS patients is not just a question of knowing the drugs the patient uses, but also knowing the patient and all of their medical needs.  "The most intricate part that leads to quality outcomes and leads to decreased costs for us is knowing the patient in total," Brannum said.

23.    Patients who need specialty medicines and suffer from complex diseases require complex treatment.   Community pharmacists that provide HIV/AIDS medications build strong personal and clinical relationships with their patients, making sure that they receive the drugs they need when they need them and even providing them discounts for these expensive medications.   The community pharmacist is an essential member of the treatment team.

24.    Furthermore, because there is no cure for HIV/AIDS, the virus continually mutates around the medications prescribed to treat it, requiring constant monitoring and immediate provision of new medication regimens to address

CLASS ACTION COMPLAINT

changes in the disease.  Periods of medication changes are particularly sensitive times for HIV/AIDS patients.  Doctors and pharmacists must review the panoply of the patient's medications for potential new adverse drug interactions, and patients must be concerned about addressing new drug side effects in the short term.

25.     To avoid serious health consequences, in addition to counseling that can only be effectively provided by community pharmacists it is imperative to discontinue the previous regimen of HIV/AIDS medications before adding or dispensing new medications.  In some instances, however, patients have reported new medication orders being submitted to the mail-order pharmacy by the patient's physician but the mail-order pharmacy incorrectly dispensed *both* the new medication and the old medication or in the incorrect dosage, creating confusion and the potential for the patient to take both medications, resulting in serious health consequences.

26.     The use of mail-order providers also creates the very real risk of delayed, lost or stolen shipments, resulting in dire consequences for many patients who must strictly adhere to their medication regimes or face serious illness or death.  Yet, as detailed below, Defendants appear to have no realistic fail-safe procedure in place to allow consumers to purchase medications at community pharmacies in the event that mail-order shipments are delayed, lost, or stolen.

27.     Aetna has replaced the present, on-going, close relationship between community pharmacist and patient with an 800 number that does not and cannot provide the same or similar level of service and benefits as detailed above. The mail-order provider, ASP, is in Florida, has no community location and Class Members are not provided regular access to a pharmacist with similar qualification levels, if at all.  Furthermore, the Program's requirement that Class Members must fax or call-in *each month* to renew their prescriptions as explained below—and work their way through automated robocalls, messages and multiple call center staff—increases stress and fatigue for patients who are literally fighting to stay

CLASS ACTION COMPLAINT

alive, exacerbating their condition.

### *Defendants' Discriminatory Business Practices Specifically Target HIV/AIDS Patients*

28.    Due to the complex nature of their disease and medications, HIV/AIDS patients are particularly hard hit and discriminated against by Aetna's unilateral decision that these patients must buy their specialty medications exclusively from the mail-order pharmacy.

29.    The Program specifically targets and discriminates against individuals that are HIV-positive or have full-blown AIDS. The Program denies full and equal access to utilize the pharmacies and method of delivery of their choice specifically because of their illness, imposes discriminatory pricing on patients that enroll in the Program, while at the same time permitting other non-HIV/AIDS enrollees to enjoy full access to the pharmacies of their choice.  This is an arbitrary and harmful distinction, since the pharmacists' role is even more important in caring for HIV/AIDS patients.

30.    While mail-order may be appropriate for some patients or some medications, it is not appropriate for all patients with complex, chronic conditions like HIV/AIDS, where the pharmacist does much more than merely dispense specialty medications.  The decision to use a mail-order pharmacy should be a matter of informed enrollee choice, not an insurance company mandate.  Aetna's change in policy and corresponding reduction in benefits creates a potential health risk for HIV/AIDS patients that require time-sensitive treatments.

31.    When Class Members inform Aetna representatives they do not want to participate in the Program, they are told they have no choice. But Defendants may have granted some enrollees who complain enough or threaten to take action the ability to not participate in the Program under a claimed exemption program. All similarly situated enrollees should be given the same opportunity to opt-out of the Program.

CLASS ACTION COMPLAINT

32.     The Affordable Care Act ("ACA"), the Americans with Disabilities Act ("ADA"), and the California Unruh Civil Rights Act ("Unruh Act") specifically outlaw discrimination based on disability, medical condition, genetic information, and other categories.  HIV/AIDS is a "disability" under the ADA, and a "medical condition" and "disability" under the Unruh Act.

33.     Aetna's Program improperly reduces benefits, breaching Aetna's fiduciary duties to Class Members and violates numerous provisions of the Employee Retirement Income Security Act ("ERISA").  Aetna's conduct is also unlawful, unfair and fraudulent, and therefore violates California Business & Professions Code section 17200, *et seq.*, numerous federal and state laws detailed below, as well as privacy rights provided by the California and U.S. Constitutions.

34.     Plaintiff seeks an order of this Court enjoining Aetna's continued violations of law.  Plaintiff also seeks damages, restitution and disgorgement based on out-of-pocket expenses Class Members may incur as a result of the Program or the profits generated by Defendants' conduct that violates the laws set forth below.

## THE PARTIES

35.     On personal knowledge, JOHN DOE is a resident of San Diego County, California.  Plaintiff JOHN DOE has been enrolled in an AetnaHealthcare PPO health plan since July 2014.  Plaintiff JOHN DOE currently purchases his HIV/AIDS-related medications from a community pharmacy located in San Diego County that specializes in serving HIV/AIDS patients.  The HIV/AIDS-related medications prescribed for JOHN DOE are included in Aetna's mail-order specialty Program.  After leaving his former employer, JOHN DOE continued his coverage under a COBRA program, which was unilaterally switched to Aetna.  JOHN DOE has expended substantial resources attempting to resolve the issues raised herein, spending hours on the phone with Aetna representatives.  In response to the November Letter he has on several occasions expressly requested to opt-out of the Program.  Despite such requests, he was informed by Defendants' representatives

12

as late as December 3, 2014 that his participation in the Program is mandatory and they refuse to indicate whether he can be excluded from the Program.

36.     Defendants Aetna, Inc., Aetna Healthcare Inc. and Aetna Specialty Pharmacy LLC are foreign corporations or liability companies organized under the laws of the States of Connecticut and Pennsylvania, with their principal places of business in at least those states, and are transacting the business of providing health plans in this State.

37.     The true names, roles and/or capacities of Defendants named as DOES 1 through 10, inclusive, are currently unknown to Plaintiff and, therefore, are named as Defendants under fictitious names as permitted by the rules of this Court.  Plaintiff will identify their true identities and their involvement in the wrongdoing at issue if and when they become known.

38.     Defendants' conduct described herein was undertaken or authorized by Defendants' officers or managing agents who were responsible for supervision and operations decisions relating to the Program.  The described conduct of said managing agents and individuals was therefore undertaken on behalf of Defendants. Defendants had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by such managing agents.  By engaging in the conduct described herein, Defendants agreed with each other to require Plaintiff and all Class Members to use the wholly-owned Aetna subsidiary ASP as their captive mail-order pharmacy, providing them with no realistic alternative, to the exclusion of their trusted community pharmacist.  As set forth below, Defendants unjustly and mutually profited as a result of this agreement in violation of the laws detailed herein.  As a result of such agreements, Defendants conspired and aided and abetted each other in violating the laws set forth herein, which conduct is on-going.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over the parties to this action.  The named

Plaintiff is a resident of California, Defendants transact business in California, and the members of the Class are resident citizens of California and all other states where the Program has been proposed to be implemented.

40. Jurisdiction over Defendants is also proper because they have purposely availed themselves of the privilege of conducting business activities in California and because they currently maintain systematic and continuous business contacts with this State and/or are based here, and have thousands of affected enrollees who are residents of this State and who do business with Aetna.

41. Venue is proper in this District under 28 U.S.C. section 1391 because Defendants maintain substantial operations in this District; many Class Members either reside or did business with Defendants in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and Defendants entered into transactions and received substantial profits from enrollees who reside in this District.

42. This Court has subject matter jurisdiction based on diversity of citizenship. Plaintiffs allege subject matter jurisdiction based on the Class Action Fairness Act (28 U.S.C. §1332(d)). In addition, federal question jurisdiction exists based on the assertion of claims for violations of the ACA, ERISA, and the ADA, as set forth below.

**STATUTORY SCHEME**

43. A central tenet of the Affordable Care Act is to end discrimination against patients based on their health status, health history, or disability.

44. Article I, Section 1 of the California Constitution guarantees "all people" the right to privacy:

/ / /

/ / /

/ / /

14

1
2
3
4

All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

5

The U.S. Constitution impliedly also recognizes a fundamental right to privacy.

6
7

45.     The Americans with Disabilities Act, 42 U.S.C. section 12182, subdivision (a), provides:

8
9
10
11
12

No individual shall be discriminated against on the basis of *disability* in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or *operates a place of public accommodation.*

13

(Emphasis added.)

14
15
16
17

46.     For purposes of the ADA, "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." (42 U.S.C. § 12102(4)(A).)

18
19

47.     The U.S. Supreme Court has recognized HIV/AIDS as a "disability" subject to the ADA. (*Bragdon v. Abbott*, 118 S.Ct. 2196, 2213 (1998).)

20
21

48.     A pharmacy is a "public accommodation" recognized by the ADA. (42 U.S.C.A § 12181(7)(F).)

22
23
24
25
26

49.     The Ninth Circuit has found that a defendant "operates a place of public accommodation" if that defendant exerts "control" over a place of public accommodation, for example as a result of a financial or contractual relationship between the defendant and the place of public accommodation. (*See e.g.*, *Lentini v. California Center for the Arts*, 370 F.3d 837, 849 (9th Cir. 2004).)

27
28

50.     Under the relevant provisions of ERISA, benefits to plan subscribers must be distributed pursuant to the terms of their ERISA plan. (29 U.S.C. §

15

1132(a)(1)(B).)  ERISA further requires that fiduciaries not put their own interests above their beneficiaries.  (29 U.S.C. § 1132(a)(2).)  In fulfilling fiduciary duties, an ERISA fiduciary must act with undivided loyalty and prudence in managing and administering the plans.  (29 U.S.C. § 1104.)  In addition, ERISA mandates that benefit plans provide full and fair review of denied claims for patient grievances as required by 29 U.S.C. section 1133, and provide a reasonable claims procedure. Finally, ERISA requires that plan administrators furnish accurate and comprehensive EOC materials under 29 U.S.C. section 1022, and accurately convey the plan's benefits in these materials.  (29 U.S.C. § 1132(a)(3) and (c); 29 U.S.C. § 1022.)

51.     The California Unruh Civil Rights Act provides that, "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, *disability*, *medical condition*, genetic information, marital status, or *sexual orientation* are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  (Civ. Code § 51(b), emphasis added.)

52.     Under the Unruh Act, "'Disability' means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code." (Civ. Code § 51(e)(1).)  "Physical and mental disabilities include, but are not limited to, chronic or episodic conditions such as *HIV/AIDS*, hepatitis, epilepsy, seizure disorder, diabetes, clinical depression, bipolar disorder, multiple sclerosis, and heart disease."  (Gov. Code § 12926.1(c), emphasis added.)

53.     Under the Unruh Act, unlawful discrimination on the basis of "'Sexual orientation' has the same meaning as defined in subdivision (r) of section 12926 of the Government Code."  (Civ. Code § 51(e)(7).)  Under the Government Code, "'Sexual orientation' means heterosexuality, homosexuality, and bisexuality."  (Gov. Code § 12926(r).)

/ / /

CLASS ACTION COMPLAINT

54.     The Unruh Act prohibits business establishments from "engaging in any form of arbitrary discrimination."  The Unruh Act addresses concerns "not only with access to business establishments, but with *equal treatment of patrons in all aspects of the business.*"     (Emphasis added.)     That Act is given a liberal construction with a view to effectuating its purposes.

55.     The California Legislature has declared that the State of California has an interest in ensuring that all people have ready and reasonably available access to HIV medications:

> (a)     State-of-art knowledge regarding treatment of people infected with the human immunodeficiency virus (HIV) indicates that active HIV infection (AIDS) can be a manageable, though chronic, condition with the use of drugs such as zidovudine (AZT), aerosolized pentamidine, and ganciclovir.  AIDS experts across the nation agree that early intervention with these drugs can prolong life, minimize the related occurrences of more serious illnesses, reduce more costly treatments, and maximize the HIV-infected person's vitality and productivity.

> (b)     For reasons of compassion and cost effectiveness, *the State of California has a compelling interest in ensuring that its citizens infected with the HIV virus have access to these drugs.*

(Health & Saf. Code § 120950; emphasis added.)

56.     Some of the health plans that are the subject of this action are regulated under the California Insurance Code.   Other Aetna health plans are regulated under parallel provisions of the California Health & Safety Code sections 1340 through 1399.99 (the "Knox-Keene Act").

57.     In adopting the Knox-Keene Act, it was the "intent and purpose of the Legislature to promote the delivery and the quality of health and medical care to the people of the State of California" by:

17

(a)   Ensuring the continued *role of the professional* as the determiner of the patient's health needs which fosters the traditional relationship of trust and confidence between the patient and the professional.

(b)   Ensuring that subscribers and enrollees are *educated and informed of the benefits and services available* in order to enable a rational consumer choice in the marketplace.

(c)   Prosecuting malefactors who make *fraudulent solicitations or who use deceptive methods, misrepresentations, or practices* which are inimical to the general purpose of enabling a rational choice for the consumer public.

(d)   Helping to *ensure the best possible health care for the public at the lowest possible cost* by transferring the financial risk of health care from patients to providers.

* * *

(g)   Ensuring that subscribers and enrollees receive available and accessible health and medical services rendered in a manner *providing continuity of care*. . . ."

(Health & Saf. Code § 1342; emphasis added.)

58.   In order to ensure seriously ill consumers receive the care they need, Insurance Code section 10273.6 guarantees that a consumer may renew his or her health plan *regardless of his health condition*. Insurance Code sections 10128.50, *et seq.* and 10901.8 similarly provide for renewability of coverage for those enrolled in COBRA coverage and other federally-qualified programs. (*See also* Health & Saf. Code §§ 1365, 1366.20, *et seq.*, 1399.810.) The federal ACA also provides that all Americans must be provided access to health insurance regardless of their health history under the so-called "guaranteed issue" provision, and prohibits discrimination against members of health plans. Therefore, Aetna cannot

directly refuse to renew or sell coverage to consumers with serious illnesses requiring on-going treatment.  However, Defendants, operating in concert, appear to be violating the intent and spirit of the law by targeting expensive-to-treat consumers with serious illnesses and making the terms of their coverage potentially unsustainable, by requiring them: (i) to either use a mandatory mail-order Program that they do not want to use under all circumstances to obtain their specialty medications, or (ii) to pay for these medications entirely as an "out-of-network" payment, even though such payments have been considered "in-network" for years.

59.    Insurance Code section 10133.5, subdivision (a) provides "that insureds have opportunity to access needed health care services in a timely manner" . . . "to assure accessibility of provider services in a *timely manner* to individuals . . . pursuant to benefits covered under the policy or contract" (emphasis added). The purpose of the statute is to ensure, among other things, that:

- "[T]he policy or contract is not inconsistent with standards of *good health care and clinically appropriate care*."  (Emphasis added).  (Ins. Code § 10133.5(b)(3).)

- "All contracts including contracts with providers, and other persons furnishing services, or facilities shall be fair and reasonable."  (Ins. Code § 10133.5(b)(4).)

60.    Similarly, Health & Safety Code section 1367, subdivision (h)(1) provides that "contracts with subscribers and enrollees, including group contracts, and contracts with providers, and other persons furnishing services, equipment, or facilities to or in connection with the plan, shall be *fair, reasonable, and consistent with the objectives of [the Knox-Keene Act]."*  Health & Safety Code section 1367, subdivision (e)(1) requires "All services shall be readily available at reasonable times to each enrollee consistent with good professional practice."

61.    Regulations promulgated pursuant to Insurance Code section 10133.5, and their parallel Health & Safety Code provisions, require that "insurers shall

CLASS ACTION COMPLAINT

ensure that":

- "Network providers are duly licensed or accredited and that they are sufficient, in number or size, to be capable of furnishing the health care services covered by the insurance contract, taking into account the number of covered persons, their characteristics and medical needs including the frequency of accessing needed medical care within the prescribed geographic distances outlined herein and the projected demand for services by type of services." (Cal. Code Regs. Title 10 § 2240.1(b)(1).)

- "Decisions pertaining to health care services to be rendered by providers to covered persons are based on such persons' medical needs and are made by or under the supervision of licensed and appropriate health care professionals." (*Id*. at (b)(2).)

- "Basic health care services (excluding emergency health care services) are available at least 40 hours per week, except for weeks including holidays. Such services shall be available until at least 10:00 p.m. at least one day per week or for at least four hours each Saturday, except for Saturdays falling on holidays." (Cal. Code Regs. Title 10 § 2240.1(b)(4).)

62.     Additionally, regulations promulgated pursuant to Insurance Code section 10133.5 provide that insurance contracts and Evidences of Coverage shall contain the following (Cal. Code Regs. Title 10 § 2240.2):

- "A provision that the insurer shall give written notice to the group contract holder, within a reasonable period of time, of any termination or permanent breach of contract by, or permanent inability to perform of, any network provider if such termination, breach or inability would materially and adversely affect the contract holder or covered persons." (*Id*. at (b).)

- "A provision that the contract holder shall distribute to the primary covered persons the substance of any notice given to the contract holder pursuant to subsection (b) not later than 30 days after its receipt." (*Id*. at (c).)

CLASS ACTION COMPLAINT

- "A provision that, pursuant to Insurance Code section 10133.56 upon termination of a network provider contract, the insurer shall be liable for covered services rendered by such provider to a covered person under the care of such provider at the time of termination until such services are completed, unless reasonable and medically appropriate arrangements for assumption of such services by another network provider are made." (*Id*. at (d).)

- "A brief and prominent warning reflecting the limitations in the contract pertaining to network provider services.  Such warning shall identify, by caption or number, the certificate provisions required by subsections (d), (e) and (f), below." (Cal. Code Regs. Title 10 § 2240.3(c) ["Network provider services" means "health care services which are covered under an insurance contract when rendered by a network provider within the service area." (Cal. Code Regs., Title 10 § 2240(g)].)

- "A provision or attachment identifying all network providers or describing where a current directory of network providers can be found on the Internet." (Cal. Code Regs. Title 10 § 2240.3(d).)

63.     Another provision of the California Code of Regulations entitled "Contracts with Exclusive Providers" requires that:

Effective June 30, 2008, contracts between network providers and insurers or their agents shall: . . . *include provisions ensuring that providers shall not discriminate* against any insured in the provision of contracted services on the basis of sex, marital status, sexual orientation, race, color, religion, ancestry, national origin, *disability, health status*, health insurance coverage, utilization of medical or mental health services or supplies, or other unlawful basis including without limitation, the filing by such insured of any complaint, grievance, or legal action against a provider.

21

(Cal. Code Regs. Title 10 § 2240.4(a); emphasis added.)

64.    Insurance Code section 10133.56 similarly allows consumers who are in the course of treatment to continue to receive treatment from their provider of choice, including clinical pharmacists, even after the health insurer terminates its contract with the provider:

(a)    A health insurer that enters into a contract with a professional or institutional provider to provide services at alternative rates of payment pursuant to Section 10133 shall, at the request of an insured, arrange for the completion of covered services by a terminated provider, if the insured is undergoing a course of treatment for any of the following conditions:

(1)    An acute condition.  An acute condition is a medical condition that involves a sudden onset of symptoms due to an illness, injury, or other medical problem that requires prompt medical attention and that has a limited duration. Completion of covered services shall be provided for the duration of the acute condition.

(2)    A serious chronic condition.  A serious chronic condition is a medical condition due to a disease, illness, or other medical problem or medical disorder that is serious in nature and that persists without full cure or worsens over an extended period of time or requires ongoing treatment to maintain remission or prevent deterioration. *Completion of covered services shall be provided for a period of time necessary to complete a course of treatment and to arrange for a safe transfer to another provider*, as determined by the health insurer in consultation with the insured and the terminated provider and *consistent with good professional practice*. Completion of covered

22

services under this paragraph shall not exceed 12 months from
the contract termination date.

(*See* also Health & Saf. Code §1373.96, which contains a similar provision.)

65.     Insurance Code sections 10603 and 10604 require health plans to "provide, in easily understood language . . . and in a uniform, clearly organized manner" information including the "principal benefits and coverage of the disability insurance policy" and the "exceptions, reductions, and limitations that apply to such policy."

66.     Similarly, Health & Safety Code section 1360 bars deceptive EOCs that misstate the prescription drug benefits available under the plan, and untrue or misleading printed and verbal statements regarding benefits and coverage:

"(a)    No plan . . . or representative shall use or permit the use of any advertising or solicitation which is untrue or misleading, or any form of evidence of coverage which is deceptive.  For purposes of this article:

\* \* \*

(2)    *A written or printed statement or item of information shall be deemed misleading* whether or not it may be literally true, if, in the total context in which the statement is made or such item of information is communicated, such statement or item of information may be understood by a person not possessing special knowledge regarding health care coverage, *as indicating any benefit or advantage, or the absence of any exclusion, limitation, or disadvantage of possible significance to an enrollee, or potential enrollee or subscriber, in a plan, and such is not the case.*

(3)    *An evidence of coverage shall be deemed to be deceptive* if the evidence of coverage taken as a whole and with consideration given to typography and format, as well as language, shall be such as

23

to cause a reasonable person, not possessing special knowledge of plans, and evidence of coverage therefor to *expect benefits, service charges, or other advantages which the evidence of coverage does not provide* or which the plan issuing such coverage or evidence of coverage does not regularly make available to enrollees or subscribers covered under such evidence of coverage.

(b)     *No plan, or solicitor, or representative shall use or permit the use of any verbal statement which is untrue, misleading, or deceptive* or make any representations about coverage offered by the plan or its cost that does not conform to fact.   All verbal statements are to be held to the same standards as those for printed matter provided in subdivision (a)."

67.    Title 28 of the California Code of Regulations, section 1300.67.24(b)(4), bars a health care service plan from adopting a mandatory prescription drug mail-order program unless the program has a fail-safe mechanism in place in the event a shipment is delayed and the patient as provided a 90-day supply of medication:

The mail order pharmacy process shall conform effectively and efficiently with a plan's processes for prior authorization for coverage of medically necessary drugs as required by the Act, *and shall include standards for timely delivery and a contingency mechanism for providing the drug if a mail order provider fails to meet the delivery standards.*

* * *

(d)(3)(C)  A plan may establish a mandatory mail order process for maintenance drugs when dispensed in a ONE months supply or greater quantities, but shall not impose any fees or costs for mandatory mail order prescriptions other than the applicable

24

copayment or coinsurance.  *A plan shall not require an enrollee to fill a prescription by mail if the prescribed drug is not available to be filled in that manner.*  (Emphasis added.)

68.     Finally, the California Consumers Legal Remedies Act, Cal. Civ. Code section 1750, *et seq*., is a statute that is to be liberally construed and applied to promote its underlying purposes "which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."  In order to promote those goals, the Legislature has set forth numerous "unfair methods of competition and unfair and deceptive practices" that are not to be undertaken by businesses in transactions intended to result in the sale of goods or services to consumers, relevant provisions of which are detailed below.

## PLAINTIFF'S FACTUAL ALLEGATIONS

### *JOHN DOE*

69.     Plaintiff JOHN DOE is HIV positive and enrolled in an Aetna health plan through COBRA.  JOHN DOE has been a member of an Aetna plan since approximately July 2014.

70.     JOHN DOE received the November Letter in November 2014.  When he called the 800 number provided, JOHN DOE was informed by an Aetna customer service representative that he had to use the mail-order provider, ASP, for his HIV/AIDS medication despite being in the middle of a course of treatment.  During November he had numerous telephone calls with Aetna representatives, one lasting over an hour and a half and several over 45 minutes, to discuss his options.

71.     JOHN DOE has previously been required to use mail-order and found the situation to be disastrous.  Each call to the mail-order provider required JOHN DOE to spend approximately 20 to 30 minutes to complete each automated telephone menu tree, verifying voluminous amounts of sensitive confidential private information (name, address, DOB, SSN, etc.) to then be told the call center

representative needed to transfer him to another person who then asked the same voluminous amounts of information, to then only pass the buck again.   All told it took JOHN DOE several hours each time he ordered his HIV/AIDS medications by mail.  JOHN DOE sums up his previous experience with a mail-order pharmacy in the following manner: "I had never experienced a more bungled bureaucratic process to get a prescription filled in my entire life!"

72.    JOHN DOE has requested that he be allowed to opt-out of the Program, both orally and in writing.  On December 4, 2014 his final request was denied, and Aetna refuses to respond to his request for an explanation.

73.    "Playing just-in-time inventory games with an HIV medication that requires nearly 100% compliance to remain effective to keep the virus under control is a short sighted business practice and a danger to my health," says JOHN DOE.

74.    JOHN DOE has been advised by his doctor to do everything possible to reduce stress in his life as stress plays a big part in undermining the human immune system.  "Stressing about whether your meds will arrive before you run out is unnecessary."

75.    Storage at high temperatures can quickly degrade the potency and stability of many medications.  When Aetna enrollees cannot be present when their medications are delivered, their only reasonable choice is to have the medications left on their doorstep.  JOHN DOE's home has a west-facing doorway.   In his previous mail-order experience, when JOHN DOE returned home he found his package of medication baking in the afternoon sun.  JOHN DOE used a Ryobi infrared thermometer and read a temperature of 124 degrees Fahrenheit off the sealed envelope.  The manufacturer recommends that medication be stored at 78 degrees Fahrenheit.

76.    Furthermore, according to JOHN DOE, the level of education of the call center representatives JOHN DOE has dealt with in the past appears to be that

CLASS ACTION COMPLAINT

of a high school graduate.  Contrast this with JOHN DOE's preferred pharmacy Aids Health Foundation (AHF).  The pharmacists at AHF are very knowledgeable and many are also HIV positive, so they understand the subtle nuances of HIV medications.

77.    Plaintiff and others similarly situated are currently facing a Morton's Fork – (i) be forced to pay thousands of dollars each month out of pocket at a community pharmacy for medications otherwise covered by their prescription drug health plan, or (ii) forego using the pharmacist who understands his or her required regimen and take advice from someone he or she has never met, who is not a pharmacist, or a pharmacist who is not readily available and with unknown qualifications, while facing discriminatory pricing in the form of excessive co-insurance charges.

## DEFENDANTS' UNLAWFUL CONDUCT

78.    Defendants' practices violate numerous provisions of federal and state law.

79.    As detailed above, the Program violates Class Members' inalienable right to privacy by eliminating their choice to keep their medical condition private by requiring public delivery of their medications by someone they do not know and who is not sensitive to their condition.

80.    The Program violates the ACA and ADA.  As explained more fully below, Defendants' discriminatory actions have denied Plaintiff and members of the Class full and equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations under their health plans.  Defendants' changes to Class Members' health plans, financial arrangements with their subsidiaries and community pharmacies, and changes to Defendants' contractual relationships with those community pharmacies—specifically, changes to the "in-network" status of those pharmacies—effectively bar Class Members' access to community pharmacies providing specialty medications.  These financial arrangements and

contractual changes have made, or will make, HIV/AIDS specialty medications unaffordable at community pharmacies where expert pharmacists provide life-saving advice and counseling on which Plaintiff and Class Members have come to rely. Therefore, Plaintiff and Class members are subject to discriminatory treatment based on their disability that threatens their health and their privacy.

81.     Defendants' conduct also violates various provisions of ERISA.  By forcing Class Members to participate in a mandatory mail-order prescription drug benefit, Defendants have failed to distribute benefits to plan subscribers pursuant to the terms of their ERISA plan, in violation of 29 U.S.C. § 1132(a)(1)(B). Defendants' unlawful requirement targeting HIV/AIDS subscribers to switch from the use of an in-network community pharmacy to a mandatory mail-order Program has caused a reduction in Plaintiff's and Class Members' benefits without a change in actual coverage or appropriate notice, and in the middle of a plan period.

82.     Defendants have also breached their fiduciary duties under ERISA by failing to act with undivided loyalty and prudence in managing and administering the plans in violation of 29 U.S.C. § 1132(a)(2).  In controlling and administering the plans, Defendants owe a duty to act solely for the benefit of Plaintiff and the Class.  However, Defendants have put their own interests above their subscribers through their conduct of discrimination and self-dealing by mandating the use of Aetna's wholly-owned subsidiary mail-order pharmacy and keeping the fees that would be paid to community specialty pharmacies, profiting as a result thereof. Defendants have put their own interests before subscribers by seeking to increase their own profits at the expense of their subscribers' health.

83.     In addition, Defendants have failed to provide full and fair review, as required by 29 U.S.C. section 1133.  Defendants have failed to provide a reasonable procedure for subscribers who wish to opt-out of the Program and any information regarding appeal of any determinations to deny opt-out requests.  By permitting some subscribers to not participate in the Program, it is evident that opting out has

been permitted on an unknown and seemingly arbitrary basis; however the criteria concerning the opt-out process, or appeal for any resultant denials, have not been disclosed by Defendants.

84.    Defendants' unlawful conduct also violates ERISA's requirement to furnish accurate and comprehensive Summary Plan Documents or EOCs under 29 U.S.C. section 1022 in violation of 29 U.S.C. section 1132(c) and (a)(3). Defendants have misled Plaintiffs and the Class by failing to disclose and accurately convey that specialty medications for treatment of HIV/AIDS will only be available by mail-order as of January 1, 2015, and by trying to obfuscate this material fact and by misrepresenting information regarding its pharmacy benefits.

85.    The Program also violates the Unruh Act, as the Program targets individuals with specific disease states.  Here, Defendants specifically target certain "specialty medicines" that are used to treat serious and chronic health conditions. In fact, due to the specialized nature of the targeted medications, this policy change predominantly impacts subscribers with serious medical conditions, and specifically for purposes of this Complaint, persons with HIV/AIDS.  Furthermore, the Unruh Act requires "equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever" for all persons regardless of "disability [or] medical condition."  The Program denies equal use of and access to community pharmacists and denies prescription drug benefits due under their health plans for only these people.

86.    As discussed above, Defendants' actions violate the intent and spirit of Insurance Code sections 10273.6, 10128.50, *et seq*., and 10901.8, and Health & Safety Code sections 1365, 1366.20, *et seq*., 1399.810 and the Affordable Care Act, which guarantee that seriously ill consumers may renew their health plan coverage, by making continued enrollment under the terms of the Program untenable.  Due to the (i) serious health risks associated with the Program, (ii) the Program's threat to Class Members' inalienable right to privacy, (iii) the prohibitively high cost of the

medications in the event the consumer opts to continue accessing care at their community pharmacy of choice, and (iv) discriminatory pricing imposed on Class Members who enroll in the Program, Defendants are, in effect, undermining, and potentially eliminating, their access to life-saving medications.  These actions constitute an unlawful constructive eviction from coverage that consumers have a legal right to renew.

87.    Defendants' conduct also violates Insurance Code section 10133.56 and Health & Safety Code section 1373.96, which allow consumers who are in a course of treatment to continue to receive treatment from their provider, including clinical pharmacists, even after an insurer terminates the contract with the provider. Under the Program, an Aetna enrollee's "initial prescription for specialty care drugs must be filled at a network retail pharmacy or at Aetna's specialty pharmacy network." Thereafter, enrollees "are required to obtain specialty care drugs at Aetna's specialty pharmacy network for all prescription drug refills after the initial fill." Therefore, for specialty medications identified by Aetna, Defendants have effectively terminated contracts with these providers.  Furthermore, HIV/AIDS is a "serious chronic condition" for which Defendants must provide continuity of care under these statutes.  Here, as shown by the above experiences, by providing little if any time to transfer to the Program in the middle of an on-going course of treatment, Defendants have failed to provide the required "period of time necessary to complete a course of treatment and to arrange for a safe transfer to another provider."  Class Members have been told in short order that they may no longer continue to have access to the pharmacists that have been providing them care as an in-network benefit, even though the need for that care from them is on-going.

88.    The Program as proposed to be implemented by Aetna violates Insurance Code section 10133.5 because in adopting the Program, Aetna unilaterally and unconscionably inserted a mail-order requirement in its health plan contracts that is not "fair and reasonable" (*see, e.g.,* Ins. Code § 10133.5(b)(4)).

Plaintiff and others similarly situated are suffering from serious illnesses. Class Members enrolled in health plans from Aetna in the first place to guarantee that they would have coverage in the event that they became ill or to provide coverage for their chronic illness. They paid their monthly dues on time. State and federal law guarantees that they can indefinitely renew their coverage. However, Aetna has unilaterally adopted the Program, making it difficult for Plaintiff and Class Members to remain enrolled in an Aetna plan or forcing them to make unacceptable choices in doing so. In these circumstances, Defendants' conduct is neither fair nor reasonable.

89. Defendant's conduct also violates Health & Safety Code section 1367(h)(1), which requires that contracts with enrollees, and contracts with providers like clinical pharmacists, to be fair, reasonable, and consistent with all the objectives of the Knox-Keene Act. As outlined herein, Defendants' conduct violates the intent of the Legislature and various statutes under the Knox-Keene Act referenced herein. For example, the Program violates Health & Safety Code section 1367, subdivision (e)(1), which requires that "[a]ll services shall be readily available at reasonable times to each enrollee consistent with good professional practice." As discussed in more detail herein, delayed deliveries of mail-order drugs violate the "reasonable time" requirement, and cutting off access to the patient's pharmacist with little to no warning is inconsistent with "good professional practice."

90. Defendants' conduct also violates Insurance Code section 10133.5 and parallel Health & Safety Code provisions by adopting contract provisions that are inconsistent with good health care and clinically appropriate care. (Ins. Code § 10133.5(b)(3).)

91. Similarly, Defendants' conduct violates regulations promulgated pursuant to Insurance Code section 10133.5 because as a result of this conduct:

/ / /

31

- Class Members are not provided regular access to duly licensed or accredited providers and pharmacists in sufficient number to be capable of furnishing the health care services covered by the insurance contract, taking into account the number of covered persons, their characteristics and medical needs, including the frequency of accessing needed medical care, in violation of California Code of Regulations, Title 10 section 2240.1, subdivision (b)(1).)

- Decisions pertaining to health care services to be rendered by providers to covered persons are not based on such persons' medical needs as Defendants have no immediate access to the full record of medications Class Members take and are not made by or under the regular supervision of licensed and appropriate health care professionals, in violation of California Code of Regulations, Title 10 section 2240.1, subdivision (b)(2).

- Basic health care services, including the provision of outpatient prescription drugs needed to treat HIV/AIDS and counseling services provided by appropriately licensed or certified medical professionals, are not available at least 40 hours per week, are not available until at least 10:00 p.m. at least one day per week or for at least four hours each Saturday, in violation of California Code of Regulations, Title 10 section 2240.1, subdivision (b)(4).

92. Defendants' conduct also violates regulations promulgated pursuant to Insurance Code section 10133.5 requiring that EOCs contain provisions regarding network provider services, which Aetna's EOCs do not contain, including:

- A provision that the insurer shall give written notice to the group contract holder, within a reasonable period of time, of any termination or permanent breach of contract by, or permanent inability to perform of, any network provider if such termination, breach or inability would materially and adversely affect the contract holder or covered persons, in violation of California Code of Regulations, Title 10, section 2240.2, subdivision (b).

- A provision that, upon termination of a network provider contract, including the contract of a network pharmacy and its pharmacists, the insurer shall be liable for covered services rendered by such provider to a covered person under the care of such provider at the time of termination until such services are completed, unless reasonable and medically appropriate arrangements for assumption of such services by another network provider are made, in violation of California Code of Regulations, Title 10, section 2240.2, subdivision (d). Even if Class Members' Evidences of Coverage contain such a provision, Defendants' conduct has violated these requirements because Aetna has failed to provide reasonable and medically appropriate arrangements for the transfer of such services.

- A *brief and prominent warning* reflecting the limitations in the contract pertaining to network provider services, including limitations

32

to network pharmacies' and pharmacists' ability to dispense specialty medications at in-network rates, including provisions required by subdivisions (d), (e) and (f), in violation of California Code of Regulations, Title 10, section 2240.3, subdivision (c).

- A provision or attachment identifying all network providers or describing where a current and accurate directory of network providers can be found on the Internet, in violation of California Code of Regulations, Title 10, section 2240.3, subdivision (d).

93.    Defendants' conduct violates another provision of the California Code of Regulations (Cal. Code Regs. Title 10 § 2240.4(a)) entitled "Contracts with Exclusive Providers," because such contracts include provisions requiring network pharmacies to discriminate against any insured in the provision of contracted services on the basis of sexual orientation, disability, health status, utilization of medical or mental health services or supplies.  Class Members are the intended third-party beneficiaries of the contracts between Aetna and its network pharmacies and pharmacists.

94.    Class Members' Certificates of Coverage and EOCs also violate Insurance Code sections 10603 and 10604 as they relate to the Program, as those provisions require health plans to "provide, in easily understood language . . . and in a uniform, clearly organized manner" information including the "principal benefits and coverage of the disability insurance policy" and the "exceptions, reductions, and limitations that apply to such policy."  Here, the EOCs misrepresent the coverage under the health plans for the specialty medications in question, and fail to provide information about the "exceptions, reductions, and limitations" to the prescription drug benefits embodied in the Program, as described herein.  Specifically,

- There is no indication that Class Members will be required to receive their specialty medications by mail-order: "Specialty care drugs are covered at the network level of benefits *only when dispensed through a network retail pharmacy* or *Aetna's specialty pharmacy network*." (emphasis added).  Indeed, there is a separate section describing "Specialty Pharmacy Network" that is defined as "[a] network of pharmacies designated to fill specialty care drugs."  There is no cross reference between the terms Specialty Pharmacy Network and "Mail Order Pharmacy", which is defined as "[a]n establishment where

33

1    prescription drugs are legally given out by mail or other carrier.

2    • Moreover, the discussion of the use of mail-order pharmacies in the
        EOCs and Certificates of Coverage in no way implies that mail order
3        is mandatory.

4    95.    For similar reasons, the November Letter, Plaintiff's and Class

5    Members' Certificates of Coverage and EOCs as they relate to the Program, as

6    well as verbal communications between Defendants and Plaintiffs and others

7    similarly situated in the form of standardized scripts and FAQ responses to

8    enrollee inquiries, violate Health & Safety Code section 1360.  The November

9    Letter is "misleading" under subdivision (a)(2) because it fails to clearly disclose

10   the actual benefit reduction, misstates the prescription drug benefits due consumers

11   under their health plans as outlined above, and misrepresents that (i) the Program

12   is mandatory instead of optional, and (ii) Class Members will not have regular

13   access to a qualified pharmacist.

14   96.    The Program violates title 28 of the California Code of Regulations,

15   section 1300.67.24(b)(4), which bars a health care service plan from adopting a

16   mandatory prescription drug mail-order program unless (i) the program has a fail-

17   safe mechanism in place in the event a shipment is delayed; and, (ii) the patient is

18   provided a 90-day supply of medication.  Here, Defendants do not have a

19   procedure in place to address a delivery failure (*e.g.*, temporary access to a

20   community pharmacy to purchase a hold-over quantity of the drug at the in-

21   network rate), in violation of subdivision (b)(4).

22   97.    By asserting such conduct is lawful when it is not, that Class

23   Members have access to a comprehensive support program when they do not, or

24   that they do not have a right to opt-out of the Program when Defendants secretly

25   provide that right to some enrollees, Defendants have also disseminated uniformly

26   misleading information to Class Members.

27   98.    Such conduct also violates various provisions of the Consumers Legal

28   Remedies Act, Civil Code section 1770, because:

34

- By adopting the Program after Class Members enrolled in coverage, Defendants have "[r]epresented that goods or services have sponsorship, approval, *characteristics*, ingredients, uses, *benefits*, or quantities which they do not have," in violation of subdivision (a)(5). (Emphasis added).

- By entering into transactions with Class Members for health plans that purportedly allow consumers to purchase their prescription drugs at community pharmacies, Defendants have "[r]epresent[ed] that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, *or which are prohibited by law*," in violation of subdivision (a)(14).

- By unilaterally altering its agreement with Class Members by adopting the Program, which dramatically threatens the health and privacy of the Class, Defendants have "[i]nsert[ed] an unconscionable provision in the contract," in violation of subdivision (a)(19).

99.     Forcing all affected enrollees to participate in the Program will cause severe detriment and irreparable harm to Class Members.   Such conduct is continuing, as Class Members either have switched against their will to the Program or are presently deciding what actions they must take.  Defendants must provide Class Members the right to not participate in the Program and instead benefit from in-person counseling from a pharmacist of their choice in order to receive the benefits and services they are entitled to receive.

## **CLASS ALLEGATIONS**

100.    This action is brought by Plaintiff both individually and on behalf of all other similarly situated persons pursuant to Federal Rules of Civil Procedure Rule 23.  Plaintiff seeks to represent the following class (the "Class"):

All persons enrolled in or covered by any health plan offered and/or administered by Aetna or its affiliates that includes a prescription drug benefit, including but not limited to insured and self-funded ERISA plans, individual plans, governmental plans, and church or group plans, and who (i) are prescribed HIV/AIDS specialty medications, and (ii) may be required to participate in the Program, but not including individual claims for personal injury or bodily harm.

35

CLASS ACTION COMPLAINT

101.    The Court should also certify the following subclass (the "California Subclass"):

> All residents of California enrolled in or covered by any health plan offered and/or administered by Aetna or its affiliates that includes a prescription drug benefit, including but not limited to insured and self-funded ERISA plans, individual plans, governmental plans, and church or group plans, and who (i) are prescribed HIV/AIDS specialty medications, and (ii) may be required to participate in the Program, but not including individual claims for personal injury or bodily harm.

102.    The precise number and identity of Class Members are unknown to Plaintiffs but can be obtained from Defendants' records.   Based on Aetna's enrollment nationwide, the Class easily numbers in thousands of persons.

103.    Common questions of law and fact predominate over any questions affecting individual members of the Class.   Such common legal and factual questions include the following:

(a)    Whether Defendants' implementation of the Program as described above violates the numerous federal and state laws and regulations detailed throughout this Complaint;

(b)    Whether Defendants engaged in an unlawful, unfair, fraudulent, misleading or deceptive business act or practice in connection with the implementation of and statements relating to the Program;

(c)    Whether Plaintiff and Class Members are entitled to damages, equitable monetary relief, disgorgement of profits and/or restitution; and

(d)    Whether Plaintiff and Class Members are entitled to an Order enjoining Defendants from engaging in the conduct here at issue.

104.    For the reasons set forth above, Plaintiff's claims are typical of the claims of the Class in that he has been or soon will be subjected to the practices at issue.  Additionally, Plaintiff has already expended personal resources as a result of

36

the acts and practices of Defendants in connection with the implementation of the Program.

105.    Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity.  Plaintiff will fairly and adequately represent and protect the interests of the Class and has no interests adverse to or which materially and irreconcilably conflict with the interests of the other members of the Class. Based on the facts detailed above, the interests of Plaintiff are reasonably co-extensive with and not antagonistic to those of absent Class Members.

106.    Plaintiff has engaged the services of counsel who are experienced in complex class litigation and the issues raised in this Complaint who will vigorously prosecute this action, and will assert and protect the rights of and otherwise adequately represent Plaintiff and absent Class Members.

107.    A class action is superior to other available means for the fair and efficient group-wide adjudication of this controversy.  The injuries suffered by individual Class Members are, while important to them, relatively small compared to the burden and expense of individual prosecution of the complex issues and extensive litigation needed to address Defendants' conduct.

108.    Individualized litigation presents a potential for inconsistent or contradictory judgments.  By contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

109.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate provisional and final declaratory and injunctive relief with respect to Class Members as a whole.

/ / /

/ / /

/ / /

37

# FIRST CAUSE OF ACTION

## Claim for Violation of Anti-Discrimination Provisions of Affordable Care Act (42 U.S.C. § 300gg-4)

110.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

111.    Section 2705 ("Section 2705") of the ACA, which applies to individual, group, self-insured and fully-insured health plans, states that a "health plan . . . *may not* establish rules for *eligibility* (*including continued eligibility*) *or coverage* based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

(1) Health status.

(2) Medical condition.

(3) Claims experience.

(4) Receipt of health care.

(5) Medical history.

(6) Genetic information

(7) Evidence of insurability.

(8) Disability.

(9) Any other health status-related factor determined appropriate by the Secretary."

42 U.S.C. 300gg-4 (emphasis added).

112.    Section 2705 implicates a central goal of the ACA: to end discrimination against those with preexisting conditions.

113.    Section 2705 specifically prohibits coverage rules based on the listed health status-related factors in determining eligibility for coverage *and* the terms of coverage. Section 2705's non-discrimination requirement is not limited to eligibility, but includes terms of coverage. Benefit changes that provide qualitatively different coverage for patients with HIV/AIDS are thus doubly

38

prohibited. The need for this prohibition is clear. Requiring health plans to offer coverage for patients with a preexisting condition means little if the insurer can charge these patients exorbitant co-insurance or only cover care through inconvenient and ineffective mail-order requirements that put the patients' health and privacy at risk. Aetna's practices attempt to do just this and are prohibited by Section 2705.

114.    Patients with HIV/AIDS who are forced into the mail-order drug Program face higher co-insurance and bear additional costs in time spent navigating phone menus and long hold times, coordinating with multiple pharmacies and pharmacists (for specialty and non-specialty drugs), and experience disruptions in their treatment. These patients also suffer from the loss of privacy at their workplace and neighborhoods where they receive regular, conspicuous deliveries.

115.    Aetna, in violation of Section 2705, has avoided providing Class Members appropriate coverage based on their health status or medical condition requiring treatment with HIV/AIDs medications, leaving them to either bear these high costs of inconvenience, increased co-insurance charges, treatment disruption, and loss of privacy, or pay thousands of dollars out of pocket each month to purchase medications at their community pharmacy of choice.

116.    The Program violates several aspects of Section 2705's prohibition on discrimination:

a.      (1) Health status, (2) Medical condition, or (5) Medical history. Aetna's requirement that HIV/AIDS patients receive medication from a mail-order pharmacy, rather than their community pharmacy, is a coverage rule based on the patients' health status and/or medical condition. A coverage rule that targets medications used exclusively by patients with HIV/AIDS is no different than a rule that is directly based on those patients' medical conditions. By requiring HIV/AIDS patients to access their life-sustaining medications through a mail-order program that threatens their health and privacy, the mail-order

CLASS ACTION COMPLAINT

requirement operates as a constructive eviction from coverage and thus erodes ongoing eligibility to receive medications. Furthermore, prospective enrollees with HIV/AIDS are impermissibly discouraged from enrolling in Aetna plans.

b.     (3) Claims experience. Aetna adopted the Program because HIV/AIDS patients utilize certain specialty medications that are often expensive. Such determinations based on claims experience of individuals enrolled in Aetna coverage is impermissible under Section 2705.

c.     (8) Disability. Finally, the U.S. Supreme Court has determined that HIV/AIDS is a "disability." *Bragdon v. Abbott*, 118 S.Ct. 2196, 2213 (1998). Therefore, coverage and eligibility distinctions resulting from a patients' HIV/AIDS status are also prohibited.

117.   Plaintiff falls within the zone of protected persons under the ACA and thus has standing to seek all appropriate relief available under this statute.

118.   Plaintiff requests attorneys' fees, costs, and such other and further appropriate relief against Aetna as may be available under this claim.

## SECOND CAUSE OF ACTION

### Claim for Violation of Anti-Discrimination Provisions of Affordable Care Act (42 U.S.C. § 18116)

119.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

120.   Section 1557 of the ACA applies the Rehabilitation Act to all health plans "receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." (42 U.S.C. 18116).  The Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be *excluded from the participation in*, be *denied the benefits of*, or be *subjected to discrimination* under any" health plan.  (29 U.S. Code § 794, emphasis added.).

/ / /

121.   Defendants are subject to the provisions of the ACA and their conduct violates the Act.

122.   Solely on the basis of their disability, Class Members have been excluded from participation in, have been denied the benefits of, or are being subjected to discrimination under their health plans.

123.   Aetna's actions of requiring health plan members to choose between risking their health and privacy by enrolling in a mandatory mail-order delivery program, charging high coinsurance rates on HIV/AIDS medications for those who enroll in the Program, and requiring patients to pay full price for their medications at their community pharmacy: (i) tends to *exclude* HIV/AIDS patients from participation in Aetna's health plans, (ii) *denies* HIV/AIDS patients the benefits of their health plans, and (iii) subjects patients with HIV/AIDS to unjust *discrimination*.

124.   Defendants' discriminatory actions have denied Plaintiff and Members of the Class full and equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations available under their health plans. Furthermore, Defendants' financial arrangements with their subsidiaries and community pharmacies, and changes to Class Members' health plan and Defendants' contractual relationships with those community pharmacies— specifically, changes to the "in-network" status of those pharmacies as to the specialty medications in question—bar Class Members' access to community pharmacies that have provided them such specialty medications for years.  These health plan changes, financial arrangements and contractual changes have made, or will make, HIV/AIDS specialty medications unaffordable at those pharmacies where community pharmacists provide life-saving advice and counseling that Class Members have come to rely on.  Therefore, Plaintiff and Class Members are subject to discriminatory treatment based on their disability that threatens their health and their privacy.

125.    Plaintiff falls within the zone of protected persons under the ACA and thus has standing to seek all appropriate relief available under this statute.

126.    Plaintiff requests attorneys' fees, costs, and such other and further appropriate relief against Aetna as may be available under this claim.

### THIRD CAUSE OF ACTION

**Claim for Benefits Due Under the Plans Governed by ERISA**
**(29 U.S.C. § 1132(a)(1)(B))**

127.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.  This cause of action applies to all Class Members whose health plans are governed by ERISA.

128.    Where a group benefits plan is insured by, funded by or administered by Aetna, Aetna must distribute benefits to plan subscribers pursuant to the terms of their ERISA plans.

129.    Aetna and its other subsidiaries violated their legal obligations under ERISA and/or California state statutory laws as may be applicable when they engaged in the conduct described in this Complaint.  These violations include Aetna's implementation of a mandatory mail-order specialty pharmacy program targeting HIV and AIDS patients and the revocation of their valuable benefit and right to use community pharmacies on an in-network basis, causing a reduction in benefits without a change in actual coverage.

130.    Plaintiff's and Class Members' Certificates of Coverage and/or Evidences of Coverage provide for benefits available for prescription drug products at either a network pharmacy or a non-network pharmacy, subject to co-payments that vary depending on the tiered drug.  Aetna's unlawful change requiring Class Members to switch from using an in-network community pharmacy to a mandatory mail-order requirement for obtaining specialty medications and the designation of the community pharmacy as now being out of network caused a reduction in Plaintiff's and Class Members' benefits without any resultant change in coverage.

42

131.   Aetna further caused a reduction in Plaintiff's and Class Members' benefits by exclusively requiring their use of a mail-order pharmacy to acquire these specialty medications, resulting in the violation of statutory regulations set forth in this Complaint.  Accordingly, as Aetna's requirement that Plaintiffs and the Class use only Aetna's subsidiary—ASP—violates the laws set forth in this Complaint and unlawfully reduces their benefits in a manner that is inconsistent with their stated coverage.

132.   Plaintiff, on his own behalf and on behalf of the Class, seeks the benefit of continued access to community pharmacies as an "in-network" benefit due under Plaintiff's and Class Members' health plans and to enjoin Aetna from continued implementation of the Program in its current form.

133.   In addition, Plaintiff requests attorneys' fees, costs, and such other and further appropriate relief against Aetna as may be available under this claim.

## **FOURTH CAUSE OF ACTION**

### **Claim for Breach of Fiduciary Duties Under ERISA**
### **(29 U.S.C. § 1132(a)(2))**

134.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.  This cause of action applies to all Class Members whose health plans are governed by ERISA.

135.   Section 1109 of ERISA provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

43

136. Aetna serves as a fiduciary under 29 U.S.C. section 1002(21)(A) for numerous plans covered by ERISA providing benefits to members of the Class because Aetna exercises sole discretionary authority with respect to management of its plans. Aetna is given exclusive discretion to interpret benefits, terms, conditions, limitations, and make factual determinations related to the health plan's benefits. As such, it owed the plans and plans' participants a duty to act with undivided loyalty and prudence in managing and administering the plans.

137. Aetna breached its duties of loyalty and prudence under ERISA by engaging in the conduct described in this Complaint, specifically through their conduct of discrimination and self-dealing. Among other things, Aetna breached its duty of loyalty and prudence by failing to act in accordance with the ACA, ADA, the Insurance Code and Health & Safety Code and other laws of California, and by failing to accurately represent the benefits due under the plan, by implementing a Program that does not satisfy minimum standards of care, and by not permitting enrollees to opt-out of the Program.

138. By requiring Plaintiff and the Class to use the Program in order to receive their pharmacy benefits, Aetna is not acting solely in the interest of the participant beneficiaries, causing a significant decrease in their benefits and higher costs to the plan participants in using the Program. Aetna has decreased plan benefits in order to increase its own profits by charging discriminatory co-insurance rates to patients that participate in the Program, and making their community pharmacists out of network for purposes of these specialty medications only but not for other medications.

139. Aetna has put its own interests before the Class Members by increasing net out-of-pocket costs to the consumer for continuing to access their pharmacist of choice and decreasing consumer choice in an effort to increase its own profits by keeping all fees with its wholly-owned subsidiary.

///

44

140.   Aetna has further breached its duties by failing to meet the requisite standard of prudence under 29 U.S.C. section 1104, which requires Aetna to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Aetna is not new to the health insurance industry and is acutely aware of its obligations as a health care entity, yet it has engaged in conduct that risks violation of its participants' health and privacy rights, and acted in direct contravention of ERISA's prudent man standard.

141.   Through these actions, Aetna has decreased Plaintiff's and Class Members' plan benefits. As a result of this wrongful conduct, the Class has or will suffer a reduction in the quality and continuity of care they receive, and an overall decrease in benefits for the plans they pay for or are provided.

142.   Aetna's wrongful conduct has consequently caused Plaintiff and the Class to suffer injuries and damages, in an amount to be determined at trial.

143.   Section 502(a)(2) of ERISA authorizes a plan participant to bring a suit for appropriate relief under 29 U.S.C. section 1109. (29 U.S.C. § 1132(a)(2).) Plaintiff, on his own behalf and on behalf of the Class, seeks the benefit of continued access to community pharmacies as an "in-network" benefit under their plans and to enjoin Aetna from continued implementation of the Program in its proposed form.

144.   In addition, Plaintiff requests attorneys' fees, costs, and such other and further appropriate relief against Aetna as may be available under this claim.

## FIFTH CAUSE OF ACTION

**Claim for Failure to Provide Full and Fair Review Required by ERISA (29 U.S.C. § 1132(a)(3))**

145.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein. This cause of action applies to all Class Members

45

whose health plans are governed by ERISA.

146.   ERISA provision 29 U.S.C. section 1133 requires that every employee benefit plan "(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant," and "(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

147.   Aetna functions as a fiduciary for numerous plans covered by ERISA providing benefits to members of the Class because Aetna exercises sole discretionary authority with respect to management of its plans. (29 U.S.C. § 1002(21)(A).)   Aetna is given exclusive discretion to interpret benefits, terms, conditions, limitations, and make factual determinations related to the health plan's benefits.  Aetna has also functioned as the "Plan Administrator" within the meaning of such term under ERISA, as it made the decision to require Class Members to use the Program.

148.   Although Aetna was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. section 1133 and the regulations promulgated thereunder by failing or denying persons who so requested the ability to do so, thus preventing Plaintiffs and the Class from even reaching a point of appeal or review.

149.   Aetna has failed to provide a reasonable claims procedure for opting-out of the Program and failed to provide information regarding any opt-out right or any appeal of adverse opt-out determinations.

150.   As a result, Aetna failed to provide a "full and fair review," and failed to make necessary disclosures to their plan members regarding any opt-out process from the Program or the ability to appeal any adverse determination.

/ / /

CLASS ACTION COMPLAINT

151.    Plaintiff and Class Members have been harmed by Aetna's failure to provide a "full and fair review" of appeals under 29 U.S.C. section 1133, and by Aetna's failure to disclose relevant information in violation of ERISA.

152.    Plaintiff is entitled to assert a claim under 29 U.S.C. section 1132, subdivisions (a)(3) for Aetna's failure to comply with the above requirements. Plaintiff, on his own behalf and on behalf of the Class, seeks the aforementioned benefit of continued access to community pharmacies as an "in-network" benefit due under their plans and to enjoin Aetna from continued implementation of the Program in its proposed form.

153.    In addition, Plaintiff requests attorneys' fees, costs, and such other and further appropriate relief against Aetna as may be available under this claim.

## SIXTH CAUSE OF ACTION

### Claim for Failure to Provide an Accurate EOC and SPD Required by ERISA (29 U.S.C. § 1132(a)(3) and (c))

154.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.  This cause of action applies to all Class Members whose health plans are governed by ERISA.

155.    Aetna has functioned as the "Plan Administrator" within the meaning of such term under ERISA, as it made the decision to require Class Members to use the Program.  As the Plan Administrator, Aetna was required to provide accurate EOC and SPD materials under 29 U.S.C. section 1022.   Aetna's disclosure obligations under ERISA include furnishing accurate EOCs, SPDs and other required information.   Under 29 U.S.C. section 1022, such a claim is privately actionable under 29 U.S.C. section 1132, subdivisions (a)(3) and (c).

156.    Pursuant to 29 U.S.C. section 1022, subdivision (a)(1), Aetna was required to provide an SPD or EOC that was "written in a manner calculated to be understood by the average plan participant," and that was "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their

rights and obligations under the plan."  Further, the SPD or EOC must contain a description of the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  (29 U.S.C. § 1022(b).)

157.   Aetna has misled Plaintiffs and the Class.  As set forth above, the November Letter failed to provide material information to Class Members that they were mandated to use mail-order as of January 1, 2014.

- Aetna failed to timely and accurately convey that the Program was mandatory and that HIV/AIDS specialty medications were only available through the Program.

- There is no indication that enrollees will be required to receive their specialty medications by mail-order: "Specialty care drugs are covered at the network level of benefits *only when dispensed through a network retail pharmacy* or *Aetna's specialty pharmacy network*." (emphasis added)  Indeed, there is a separate section describing "Specialty Pharmacy Network" that is defined as "[a] network of pharmacies designated to fill specialty care drugs."  There is no cross reference between the terms Specialty Pharmacy Network and "Mail Order Pharmacy", which is defined as "[a]n establishment where prescription drugs are legally given out by mail or other carrier.

- Moreover, the discussion of mail order pharmacies in the SPD in no way implies that the use of mail-order for obtaining specialty medications is a mandate.

158.   Aetna has failed to timely disclose and misrepresented material information regarding pharmacy benefits.  In addition, Aetna has failed to disclose the procedures to be followed in presenting claims for benefits under the plans in connection with any applicable request to opt-out of the Program or any applicable waiver criteria.   As a result, Aetna has misrepresented Plaintiff's and Class Members' coverage regarding prescription drug benefits by not explaining any applicable opt-out process or the criteria therefor or any appeals procedure, or even clearly advising them that as of January 1, 2015, they can only acquire their medications through a mail-order program.

159.   Aetna's failure to accurately disclose material information about the Program violates ERISA.  As a result of Aetna's wrongful conduct, Plaintiff and the Class have suffered a loss of benefits without a change in actual coverage,

resulting in Aetna's unjust enrichment.  Aetna has thus failed to provide a "full and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to their plan members regarding any applicable the opt-out process from the Program.

160.   By requiring Plaintiff and the Class to only use ASP under the Program and failing to accurately convey material plan information regarding this requirement, Aetna experienced increased profits and was unjustly enriched at the expense of Plaintiff and the Class.

161.   Plaintiff and the Class have been harmed by Aetna's failure to comply with 29 U.S.C. section 1022, which caused a loss of benefits without actual change in coverage.

162.   Plaintiff and Class Members have also been harmed by Aetna's failure to provide a "full and fair review" of any appeals under 29 U.S.C. section 1133, and by Aetna's failure to disclose relevant information regarding any opt-out procedures, all in violation of ERISA.

163.   Aetna's failure to supply accurate EOCs, Certificates of Coverage, SPDs and other required information is actionable under 29 U.S.C. section 1132(c).

164.   Plaintiff, on his own behalf and on behalf of the Class, seeks the benefit of continued access to community pharmacies as an "in-network" benefit due under their plans and to enjoin Aetna from continued implementation of the Program in its proposed form.  In addition, Plaintiff requests attorneys' fees, costs, and such other and further appropriate relief against Aetna as may be available under this claim.

## SEVENTH CAUSE OF ACTION

### Violation of Americans with Disabilities Act
### (42 USCA § 12101, *et seq.*)

165.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

49

166.    The Americans with Disabilities Act, 42 U.S.C. section 12182, subdivision (a), provides:

> No individual shall be discriminated against on the basis of *disability* in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or *operates a place of public accommodation.*

167.    By implementing the Program, which has or will effectively terminate community pharmacists from Plaintiff's and Class Members' network of services, Defendants have specifically targeted individuals on the basis of a particular disability and affirmatively discriminated against such persons on the basis of their disability.

168.    As the Program only applies to certain high cost specialty medications designed to treat very complicated disorders, but permits Plaintiff and Class Members to continue to use their pharmacist of choice as an in-network benefit for other medications, including other medications prescribed to the same individuals, the Program is directed at seriously ill enrollees with "disabilities" protected by the ADA.

169.    For purposes of the ADA, "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." (42 U.S.C. § 12102(4)(A).)

170.    Under the ADA, the term "disability" means, with respect to an individual: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." (42 U.S.C. § 12102(1)(A)-(C).)  "Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

50

walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." (42 U.S.C. § 12102(2)(A).) A "major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." (42 U.S.C. § 12102(2)(B).)

171.    The U.S. Supreme Court has recognized HIV/AIDS as a "disability" subject to the ADA.

172.    A pharmacy is a "public accommodation" recognized by the ADA. (42 U.S.C. § 12181(7)(F).)

173.    The Ninth Circuit has found that a defendant "operates a place of public accommodation" if that defendant exerts "control" over a place of public accommodation, for example as a result of a financial or contractual relationship between the defendant and the place of public accommodation.

174.    Defendants' discriminatory actions have denied or will deny Plaintiff and members of the Class full and equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations available under their health plans.

175.    Defendants' financial arrangements with their subsidiaries and the community pharmacies, and changes to Class Members' health plans and Defendants' contractual relationships with those community pharmacies—specifically, changes to the "in-network" status of those pharmacies as to the specialty medications in question—bar Class Members' access to community pharmacies that have provided them such specialty medications for years. These financial arrangements and contractual changes have made, or will make, HIV/AIDS specialty medications unaffordable at those pharmacies where community pharmacists provide life-saving advice and counseling that Plaintiff and Class Members have come to rely on. Therefore, Plaintiff and Class Members are

subject to discriminatory treatment based on their disability that threatens their health and their privacy.

176.   In using their direct and on-going financial incentives and contractual control over local community pharmacies to discriminatorily deny Plaintiff and Class Members' access to life-saving counseling and appropriate access to life-sustaining medications, Defendants have created a nexus between their health plans, the special medications at issue, and these community pharmacies. Therefore, there is a nexus and connection between a public accommodation and the disparity in benefits, services, facilities, privileges, advantages, and accommodations that Aetna makes available to Class Members compared to other enrollees who are not currently prescribed specialty medications.

177.   Due to Defendants' significant direct control over local pharmacies, exercised through those contractual agreements and financial arrangements and making these specialty medications an "out-of-network" event, Defendants are deemed, for purposes of the ADA, to "operate" those pharmacies.

178.   A plaintiff proceeding under the "nexus" theory need not plead denial of physical access to a place of public accommodation.  Intangible barriers equally restrict a disabled person's ability to enjoy goods, services and privileges.

179.   Neither Defendants' conduct, nor the terms of the Program, reflects appropriate underwriting or classifying of risks, or administering such risks.

180.   Under the ADA, any person who is subjected to discrimination on the basis of disability, or who has reasonable grounds for believing that such person is about to be subjected to discrimination, may seek appropriate remedies.  (42 U.S.C. § 12188.)

181.   Plaintiff and Class Members have and will continue to be harmed by Defendants' actions through the loss of access to community pharmacies and pharmacists of their choice, the reduction in quality of continued care they received prior to initiation of the Program, and the interference and severing of their

CLASS ACTION COMPLAINT

continuity of care.

182.   Defendants' conduct has or will cause harm to Plaintiff and all other similarly situated Class Members, and is a substantial factor in causing such harm.

183.   Plaintiff seeks an order enjoining Defendants from continuing to engage in such conduct.

184.   As a proximate result of Defendants' conduct, Plaintiff was forced to seek legal representation.  Plaintiff also seeks attorneys' fees and costs, and all other additional appropriate relief as may be available under this cause of action.

## EIGHTH CAUSE OF ACTION

### Violation of Cal. Business & Professions Code Section 17200, *et seq.* – Unlawful Business Acts and Practices

185.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

186.   Business & Professions Code section 17200, *et seq.* prohibits acts of "unfair competition", which is defined by Business & Professions Code section 17200 as including "any unlawful, unfair or fraudulent business act or practice. . . ."

187.   The acts and practices as described above violate Business & Professions Code section 17200's prohibition against engaging in "unlawful" business acts or practices, by, *inter alia*, violating the above-stated provisions of federal and state law including the ACA, ADA, the Unruh Act, the Civil Code, the Insurance Code, the Health & Safety Code, the California Code of Regulations, the Consumers Legal Remedies Act, and the other laws as set forth in detail above.

188.   Plaintiff has already been injured in fact and/or imminently will suffer injury in fact and a loss of money or property as a result of Defendants' unlawful business acts and practices by, *inter alia*, spending hours dealing with these issues, having benefits in which he has or had a vested interest materially reduced or eliminated, and either paying or being told he will need to pay increased amounts for such specialty medications, even if covered, if he continues to obtain such

53

medications from the community pharmacist of his choice or through the Program.

189. As a result of Defendants' violations of the UCL, Plaintiff and Class Members are entitled to equitable relief in the form of full restitution and disgorgement of the profits derived from these unlawful business acts and practices. Insofar as such remedies are intended to deter such conduct, Plaintiff and Class Members are also entitled to additional monetary relief under Cal. Civ. Code section 3345 based on the gravity of the conduct as set forth in detail above.

190. Plaintiff also seeks an order enjoining Defendants from continuing these unlawful business practices and from engaging in such conduct. Plaintiffs pray for all applicable relief as set forth below.

## **NINTH CAUSE OF ACTION**

**Violation of Cal. Business & Professions Code Section 17200, *et seq.* –
Unfair Business Acts and Practices**

191. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

192. The acts and practices of Defendants, as described above, and each of them, constitute "unfair" business acts and practices.

193. Defendants' conduct does not benefit consumers or competition. Indeed, the harm to consumers and competition is substantial for the reasons set forth above.

194. Plaintiff and Class Members could not have reasonably avoided the injury each of them suffered based on mandatory implementation of the Program, which injury is substantial, even though Plaintiff has attempted to do so.

195. The gravity of the consequences of Defendants' conduct as described above outweighs any justification, motive or reason therefor and is immoral, unethical, unscrupulous, offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, or is substantially injurious to Plaintiff and other members of the Class.

54

196.    Plaintiff has already been injured in fact and/or will suffer injury in fact and a loss of money or property as a result of Defendants' unfair business acts and practices by, *inter alia*, spending hours dealing with these issues, having benefits in which he has a vested interest materially reduced or eliminated, and either paying or being told will need to pay increased amounts for such specialty medications, even if covered, if they continue to obtain such medications from the community pharmacist of his choice or through the Program.

197.    As a result of Defendants' violations of the UCL, Plaintiff and Class Members are entitled to equitable relief in the form of full restitution and disgorgement of the profits derived from these unfair business acts and practices. Insofar as such remedies are intended to deter such conduct, Plaintiff and Class Members are also entitled to additional monetary relief under Cal. Civ. Code Section 3345 based on the gravity of the conduct as set forth in detail above.

198.    Plaintiff also seeks an order enjoining Defendants from continuing to engage in such conduct.

199.    THEREFORE, Plaintiff prays for all applicable relief as set forth below.

## TENTH CAUSE OF ACTION

**Violation of Cal. Business & Professions Code Section 17200, *et seq.* –
Fraudulent Business Acts and Practices**

200.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

201.    The acts and practices of Defendants as described above constitute "fraudulent" business practices under Business & Professions Code section 17200, *et seq.*

202.    As more fully described herein, Defendants' misleading communications such as set forth in the November Letter and other similar communications, including not making it clear such medications will be subject to a

55

mandatory mail-order Program as of January 1, 2015, claiming Class Members will be able to access comprehensive support or that the Program is being implemented "to help you receive high-quality, cost effective health care", are likely to deceive reasonable consumers into believing they have no reasonably available choice other than to participate in the Program.

203.   Class Members were additionally likely to be deceived regarding Aetna's written announcement of the additional cost of using their pharmacists of choice or obtaining their medications through the Program when imposing such additional costs is prohibited by law, or being told by Defendants that they have no ability to opt-out of the Program.

204.   Defendants' misrepresentations and omissions of fact were material and were a substantial factor in Class Members' decisions to enroll and/or remain in the Program and risk their health and privacy and pay more for their medications, or the decision of Class Members to stay with their pharmacist and pay additional money.

205.   These acts and practices resulted in and caused Plaintiff and Class Members to participate in the Program even though they did and do not desire to do so, to not pursue all alternatives, to pay more for medications, or to accept lesser benefits and services than they would have received absent Defendants' conduct.

206.   Plaintiff has already been injured in fact and/or will suffer injury in fact and a loss of money or property as a result of Defendants' fraudulent business acts and practices by, *inter alia*, spending hours dealing with these issues, having benefits in which he has a vested interest materially reduced, and/or paying increased amounts for such specialty medications, even if covered, if he continues to obtain such medications from the community pharmacist of his choice or through the Program, and receiving lesser benefits under the Program.

207.   As a result of Defendants' violations of the UCL, Plaintiff and Class Members are entitled to equitable relief in the form of full restitution and

disgorgement of the profits derived from these fraudulent business acts and practices. Insofar as such remedies are intended to deter such conduct, Plaintiff and Class Members are also entitled to additional monetary relief under Cal. Civ. Code section 3345 based on the gravity of the conduct as set forth in detail above.

208.    Plaintiff also seeks an order enjoining Defendants from continuing to engage in such conduct.

209.    THEREFORE, Plaintiff prays for all applicable relief as set forth below.

## ELEVENTH CAUSE OF ACTION

### Common Counts and Assumpsit/Common Law Restitution

210.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

211.    Plaintiff and the Class conferred upon Defendants economic benefits in the form of revenues and profits.

212.    Aetna accepted or retained these economic benefits with awareness that Plaintiff and the Class were receiving improperly reduced benefits by being required to participate in the Program, yet in many instances were paying the same or higher costs.

213.    Additionally, ASP unjustly benefitted by obtaining revenues and profits from Plaintiffs and Class Members who would not otherwise do business with it absent the illegal conduct engaged in by Defendants.

214.    Permitting Defendants to retain the unjust benefits and enrichment conferred by Plaintiff and the Class resulting from the acts and practices at issue under these circumstances is unjust and inequitable.  These amounts can be calculated as a sum certain upon Defendants providing access to the appropriate records in the course of discovery, but in general can be determined based on the amount of monies saved by Defendants by eliminating pharmacists from the specialty medication delivery equation, requiring Class Members to obtain specialty

CLASS ACTION COMPLAINT

medications only from Aetna's wholly-owned subsidiary and the co-insurance charges sent to the mail-order pharmacy, or the amount of co-insurance charges or of out-of-network payments made by Class Members as a result of the implementation of the Program.

215.    As a result of Defendants' conduct, Plaintiff and the Class have suffered harm and thus seek an order for disgorgement and restitution of Defendants' revenues, profits and other benefits resulting from the acts and practices at issue herein.

## TWELFTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

216.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

217.    The agreements described in this Complaint contain an implied covenant of good faith and fair dealing that is incorporated into all contracts as a matter of law that, *inter alia*, such contracts shall be performed and executed consistent with the requirements of all applicable laws and enforced in a manner that acts to protect and make effective the interests of Plaintiff and Class Members in having the promises required by the agreements and law performed and by ensuring companies do not engage in unfair dealing.  No breach of any specific provision of the parties' agreements need be shown in order to assert this claim.

218.    Defendants, either separately or by acting in concert, breached this duty of good faith and fair dealing owed to Plaintiff and Class Members, and in undertaking such actions frustrated or denied them the benefits of their original bargain, charging them the same or higher costs.

219.    Defendants also breached this duty of good faith and fair dealing owed to Plaintiff and members of the Class by other acts or omissions of which Plaintiff are presently unaware and which will be shown according to proof at trial.

///

220.    As a proximate result of the conscious and objectively unreasonable conduct of Defendants as set forth above, which conduct was either intended, designed to or did frustrate the rights of Plaintiff and Class Members arising out of the purposes of such agreements and their reasonably justified expectations based upon the requirements of the law, Plaintiff and members of the Class have suffered and/or will continue to suffer in the future damages plus interest, and other economic and consequential damages, in an amount to be proven at trial.   As a further proximate result of the conduct of Defendants, Plaintiff was compelled to retain legal counsel and to institute litigation to obtain the benefits of these agreements and covenants for the benefit of himself and all other Class Members.

## THIRTEENTH CAUSE OF ACTION

### Violation of Unruh Civil Rights Act
### (Cal. Civ. Code § 51, *et seq.*)

221.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

222.    The Unruh Civil Rights Act, Civil Code section 51(b), provides:

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

223.    For all the reasons set forth above, Defendants' actions have denied Plaintiff and Members of the Class full and equal benefits under their health plans as compared to persons not prescribed HIV/AIDS specialty medications. Defendants also discriminated or made a distinction that denied Plaintiff and Class Members full benefits under those health plans.

/ / /

59

224.   Defendants' actions constitute discrimination on the basis of medical condition, disability, genetic information, and sexual orientation as set forth herein by permitting them to obtain certain medications at the pharmacy of their choice, but HIV/AIDS specialty medications only through the Program.

225.   Defendants' Program results in arbitrary discrimination.   While Defendants may assert that requiring seriously ill patients to fill prescriptions for certain expensive drugs through a mail-order pharmacy service is factually and rationally related to providing cost-effective health care, in fact an increased risk of detrimental health, and loss of personal privacy associated with mail-order pharmacy services may actually *increase costs* and personal hardship over time.

226.   Furthermore, community standards in California and elsewhere do not comport with health insurance companies subjecting enrollees with HIV/AIDS to different and riskier means of obtaining life-sustaining medications, and thus does not implicate a compelling societal interest.

227.   The Program also reinforces harmful stereotypes of excluding Class Members from the normal societal means of acquiring complex medications – such as requiring them to go to two allegedly "separate but equal" facilities to fill their prescriptions, as compared to one for both their specialty and non-specialty medications.

228.   Such arbitrary discrimination has the effect undermining the benefits of Class Members' health plans and terminating continued community pharmacy access, and will deny them equal and full use and access of these community pharmacy facilities and pharmacists.

229.   By implementing the Program, which will effectively terminate the community pharmacists from Plaintiff's and Class Members' network of service for their specialty medications, Defendants have specifically targeted individuals that have a particular chronic disease and intentionally and affirmatively made a distinction or discrimination against such persons on the basis of their specific

chronic disease.  Such conduct is prohibited by the Unruh Civil Rights Act, Civil Code section 51, *et seq.*

230.    Plaintiff's and others' specific chronic medical condition and the need to procure expensive specialty medications to treat that chronic condition was a motivating reason for Defendants' conduct in terminating Class Members' access to HIV/AIDS community specialty pharmacies and pharmacists and requiring them to access such medications solely through the Program.

231.    Plaintiff and Class Members have and will continue to be harmed by Defendants' actions as a result of the Program through the loss of access to their local pharmacy and community pharmacist, materially affecting their continuity of care.

232.    Defendants' conduct has or will cause harm to Plaintiff and Class Members, and is a substantial factor in causing such harm.

233.    As a proximate result of Defendants' conduct, Plaintiff and Class Members who can assert such a claim are entitled to recover actual, compensatory and statutory damages in an amount to be proven at trial, as well as attorneys' fees and costs.

234.    Plaintiff is seeking to recover the $4,000 per person minimum per violation damages that Civil Code section 52 imposes for violations of the Unruh Civil Rights Act, as augmented by Cal. Civ. Code section 3345 to the fullest extent he can do so based on Aetna's violation of the criteria set forth in those statutes.

235.    In addition, Defendants' concerted conduct as described herein was intended by them to cause injury to members of the Class and/or was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights of members of the Class, subjected members of the Class to cruel and unjust hardship in conscious disregard of their rights, and was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with the intention to deprive members of the Class property and legal rights or to

otherwise cause injury, such as to constitute malice, oppression or fraud under Civil Code section 3294, thereby entitling Plaintiff and members of the Class who may assert such a claim to exemplary damages in an amount appropriate to punish or set an example of Defendants.

## FOURTEENTH CAUSE OF ACTION

### Declaratory Relief

236.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

237.   An actual controversy over which this Court has jurisdiction now exists between Plaintiff, members of the Class and Defendants concerning their respective rights, duties and obligations under various agreements as set forth herein.  Plaintiff desires a declaration of rights regarding contracts with Defendants, including whether: (a) Defendants may implement the Program under its proposed terms; (b) whether the agreements can unilaterally be modified by Defendants, particularly in the middle of a plan period; and (c) whether Class Members have a right to opt-out of the Program.  Such declarations may be had before there has been any breach of such obligation in respect to which such declaration is sought.

238.   Plaintiff and Class Members may be without adequate remedy at law, rendering declaratory relief appropriate in that:

(a)   relief is necessary to inform the parties of their rights and obligations under the agreements asserted herein;

(b)   damages may not adequately compensate Class Members for the injuries suffered, nor may other claims permit such relief;

(c)   the relief sought herein in terms of ceasing such practices may not be fully accomplished by awarding damages; and

(d)   if the conduct complained of is not enjoined, harm will result to Class Members and the general public because Defendants' wrongful conduct is both threatened as to those Class Members who have yet to sign

62

up for or be subjected to the Program and/or is continuing as to those Class Members are subjected to the Program and who desire to not participate in the Program and are currently being denied or not informed of any ability to opt-out of the Program.  A judicial declaration is therefore necessary and appropriate at this time and under these circumstances so the parties may ascertain their respective rights and duties.

239.    Plaintiff requests a judicial determination and declaration of the rights of Class Members, and the corresponding responsibilities of Defendants.  Plaintiff also request an order declaring Defendants are obligated to not enforce the Program as currently proposed to be implemented and provide Plaintiff and Class Members the opportunity not to opt-out of the Program, or pay restitution to all members of the Class as appropriate and pay over all funds Defendants wrongfully acquired either directly or indirectly as a result of the illegal conduct by which Defendants were unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief as follows as applicable for the particular cause of action:

1.    An Order certifying this action to proceed on behalf of the Class, including the California Subclass, and appointing Plaintiff and the counsel listed below to represent the Class;

2.    An Order awarding Plaintiff and the Class members entitled to such relief restitution and/or disgorgement and such other equitable relief as the Court deems proper;

3.    An Order enjoining Defendants from threatening or implementing the Program in its currently proposed form in violation of applicable law or other appropriate injunctive relief;

4.    An Order providing a declaration of rights as enumerated herein;

5.    An Order awarding Plaintiff and the Class members entitled to such

relief actual, compensatory, statutory and/or exemplary damages;

6.      An Order awarding Plaintiff's counsel attorneys' fees, expert witness fees and other costs pursuant to, *inter alia*, Code Civil Procedure section 1021.5 and the federal and state statutory causes of action set forth above that permit such an award; and

7.      An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and causes of action so triable.

DATED:  December 19, 2014          **WHATLEY KALLAS, LLP**


By:  S/Alan M. Mansfield
        Alan M. Mansfield (SBN 125998)
(Of Counsel)
amansfield@whatleykallas.com
10200 Willow Creek Road, Suite 160
San Diego, CA  92131
Tel: (619) 308-5034
Fax: (855) 274-1888

**CONSUMER WATCHDOG**


By:  S/Jerry Flanagan
        Jerry Flanagan (SBN 271272)
jerry@consumerwatchdog.org
2701 Ocean Park Blvd., Suite 112
Santa Monica, CA 90405
Tel: (310) 392-0522

*Attorneys for Plaintiff*

64

EXHIBIT 1

Member

Notice Date
November 3, 2014

Need more Information?
Visit **www.aetnanavigator.com**, your secure member website.
Or call the appropriate toll-free number on your member ID card.

**aetna**®



0187449

# Changes to your prescription drug coverage take effect January 1, 2015

Thank you for being an Aetna member. Each year at this time, we update our drug list (also called the formulary). We add and remove drugs. We also change coverage requirements for some drugs. For example, some drugs require a special approval process called precertification. This process helps us to make sure that the drug meets necessary criteria so that we can decide if we can cover it or not. We make these changes to help you receive high-quality, cost-effective health care.

## What's changing?
Our records show that in the last several months you filled prescriptions for one or more drug(s) that may be affected by upcoming formulary changes. Please review the information below to see how this may affect you.

You may lower your out-of-pocket costs when you use an alternative drug that's on our formulary. If your doctor agrees that a formulary alternative will work for you, please ask to have your prescription changed. If you can't take a formulary drug, of if you are currently taking a drug that will begin to require precertification after January 1, 2015, your doctor must request this authorization on your behalf. We will need to approve the drug for you to continue to have coverage.

## You may save money when you choose a generic drug
The Food and Drug Administration (FDA) ensures that generic drugs are safe and effective. When you choose a generic drug, you will also typically save money. To learn more about generic drugs, visit **www.fda.gov/cder** or call 1-888-INFO-FDA. Consumer Reports (**www.CRBestBuyDrugs.org**) also has good information. You can use this information to work with your doctor to choose the right drug for you that may also help to save you money.

## Please contact us if you have questions
We want your experience to be a positive one. We're here to help. You can learn more online or by phone. Log in to www.aetnanavigator.com, and select "Contact Us." Or, feel free to call us at the toll-free number on your Aetna member ID card.



0187449



# Changes to your prescription drug coverage

Below is a list of drugs that you may have taken in the past year. As of January 1, 2015, there will be changes to your pharmacy benefit plan. Please consider trying an alternative.

**Key**

*Generic in 2015* = Anticipate generic drug to become available in 2015. When a generic drug becomes available, the brand-name drug may be covered at a higher copayment in open formulary plans and added to the Formulary Exclusions List in closed formularies. The brand-name drug may also be added to the Precertification, Quantity Limit or Step-Therapy Lists.

*PA* = Prior Authorization or Precertification only applies if your plan includes the Precertification Program. If this is required your doctor must contact Aetna to request approval of coverage.

*PDL* = Preferred Drug List

*QL* = Quantity Limits only applies if your plan includes the Precertification Program. If you exceed the quantity limit, your doctor must contact Aetna to request approval of coverage.

*SEL* = Medication on the Safety Edit List - Prior Authorization and/or Quantity Limits will apply for all plans

*SF* = Split Fill applies. This means that half of a one month's supply of medicine is filled at a time.

*SPB* = Specialty Pharmacy Benefit

*ST* = Step-Therapy only applies if your plan includes the Step-Therapy. This means you are required to try one or more prerequisite drug(s) before a step-therapy drug will be covered.

| Your medicine | What's changing? | Alternative drug(s) |
|---|---|---|
| OXYCONTIN | Added to ST, Added to PA, Removed from PDL | controlled-release morphine sulfate tablets, OPANA ER |
| STRIBILD | Moved to SPB | Drug is moving to specialty pharmacy benefit |